1  MARC M. SELTZER (54534)
   DAVID C. MARCUS (158704)
2  MAURICE M. SUH (147485)
   SUSMAN GODFREY L.L.P.
3  1880 Century Park East, Suite 950
   Los Angeles, California 90067-1606
4  Telephone: (310) 789-3100

5  STEPHEN D. SUSMAN
   SUSMAN GODFREY L.L.P.
6  1000 Louisiana, Suite 5100
   Houston, Texas 77002-5096
7  Telephone: (713) 651-9366

8
   Attorneys for Plaintiff
9  Masimo Corporation

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                   **WESTERN DIVISION**

14

15 MASIMO CORPORATION, a Delaware ) CASE NO. CV02-4770 MRP(AJWx)
   Corporation,                   )
16                                ) **COMPLAINT FOR:**
         Plaintiff,                )
17                                ) **(1) VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**
   vs.                            )
18                                )
   TYCO HEALTH CARE GROUP L.P., a ) **(2) VIOLATIONS OF THE CLAYTON ACT**
19 Delaware Partnership, and      )
   MALLINCKRODT, INCORPORATED, a  )
20 Delaware Corporation,          ) **JURY TRIAL DEMANDED**
                                  )
21        Defendants.              )
                                  )
22 _____)

ENTER ON ICMS
MAY 29 2002

490506v1/005961

05/22/2002 At 11:25 AM   Receipt #: 15377
Cashier : [illegible]
Paid by: ENRON COMPANY, LLP
[illegible]
2002-025200        5 - Filing Fee Civil (1)
[illegible]                              $60.00
[illegible]
2002-510000       11 - Special Fund T/F(1)
[illegible]                              $90.00
Check Payment : 1477 /         150.00
Total Payment :                150.00

## NATURE OF THE ACTION

1. Plaintiff Masimo Corporation ("Masimo"), by its attorneys, for its claims against defendants, alleges on information and belief, except as to those allegations pertaining to itself and its own conduct, which are alleged upon knowledge, as follows: Masimo brings this action to recover damages and to obtain an injunction and other equitable relief for violations of the antitrust laws of the United States committed by defendants Tyco Healthcare Group L.P. ("Tyco Healthcare") and Mallinckrodt, Inc. ("Mallinckrodt"), its wholly-owned subsidiary (collectively, "Tyco"). Tyco manufactures and sells pulse oximetry products under the brand name Nellcor. Pulse oximetry involves the measurement of a critical care patient's pulse and blood oxygen levels and uses electronic circuitry to convert the input from an optical sensor attached to a patient's body, typically a finger, to provide a visual readout of those levels. Pulse oximetry products consist of sensors, patient cables, and pulse oximeters, which function together to measure the pulse rate and amount of oxygen contained in the blood of critical care patients. Tyco has long held and has unlawfully maintained monopoly power in the nationwide markets for pulse oximetry sensors and patient cables, and has manipulated the market for pulse oximeters to assist it in maintaining that power. Masimo has developed superior pulse oximetry products which threaten to undermine the dominant position of Tyco. Sensing that Masimo poses a significant threat to its illegal monopoly, Tyco has used its dominant market position to prevent hospitals from purchasing Masimo's superior pulse oximetry products. Masimo has been injured by Tyco's anti-competitive practices and it seeks relief for these injuries herein for violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.

## PARTIES

2. Plaintiff Masimo is a Delaware corporation with its principal place of business at 2852 Kelvin Avenue, Irvine, California.

490506v1/005961

2.

3. Defendant Mallinckrodt is a Delaware corporation, with its principal place of business in St. Louis, Missouri. Mallinckrodt purchased Nellcor in August 1997. Nellcor was one of the original manufacturers of pulse oximetry products in the United States. Mallinckrodt has continued to sell pulse oximetry products under the brand name Nellcor.

4. Defendant Tyco Healthcare is a Delaware limited partnership. It acquired Mallinckrodt in 2000.

## JURISDICTION

### Subject Matter Jurisdiction

5. Plaintiff brings this action under the federal antitrust laws to recover damages for the injury which it has sustained to its business and property and for injunctive and other equitable relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Therefore, the Court has jurisdiction over this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337.

## VENUE

6. Venue is proper in this district under 15 U.S.C. §§ 15 and 22, and under 28 U.S.C. § 1391(b) and (c) because: (i) Tyco transacts business and is found within the Central District of California; (ii) plaintiff's principal place of business is within this district; and (iii) a substantial portion of the events giving rise to plaintiff's claims occurred within this district.

## NATURE OF THE CASE

### MASIMO INVENTS A REVOLUTIONARY PRODUCT

7. Masimo designs, manufactures and sells pulse oximetry products. Pulse oximetry involves the use of sophisticated electronic circuitry (a "pulse oximeter") to convert the output from an optical probe (a "sensor") attached by cable to a patient (a "patient cable") into a visual readout of the patient's pulse rate and arterial blood oxygen level. A patient's arterial blood oxygen saturation level is

1  a critical measure which is used to determine whether a patient is receiving needed
2  oxygen.

3         8.      Although pulse oximetry products were invented in 1972 in Japan and
4  brought to market in the United States in the early 1980s, their utility in critical care
5  situations was limited by their inability to obtain accurate arterial blood oxygen
6  readings in patients who were moving and in patients with low blood flow
7  (perfusion). The absence of an accurate blood oxygen saturation reading under these
8  circumstances can cause health care providers to give too much supplemental
9  oxygen, which can cause blindness, or too little supplemental oxygen, which can
10 cause brain injury or death.

11        9.      Masimo developed breakthrough pulse oximetry products that solved
12 this problem, employing what is known as Masimo Signal Extraction Technology
13 ("Masimo SET"). This technology filters out movement and other "noise" to
14 achieve accurate readings of blood oxygen and pulse rate under a variety of
15 conditions. Masimo SET was first brought to market in the United States in 1998.
16 Since its introduction, Masimo SET has been widely recognized as an innovative
17 product that has transformed pulse oximetry. Indeed, Masimo's pulse oximetry
18 products employing Masimo SET technology were the first to obtain Food and
19 Drug Administration ("FDA") clearance to monitor patients during motion and low
20 perfusion. Moreover, over fifty published clinical trial studies have found that
21 Masimo's pulse oximetry products are superior to all others. To this day, Masimo
22 SET technology provides more accurate and reliable blood oxygen readings than
23 any other technology in the world.

24       10.     Typically, a pulse oximeter is incorporated in a multi-parameter patient
25 monitoring ("MPPM") device, which analyzes a number of a patient's vital signs.
26 Masimo licenses Masimo SET technology to other companies which manufacture
27 MPPMs. These manufacturers, also known as Masimo licensees, Masimo partners
28 or original equipment manufacturers ("OEMs"), incorporate Masimo SET

technology into their monitors. Masimo also manufactures and sells stand-alone pulse oximeters, which can be connected to MPPMs to upgrade them. Together, MPPMs and stand-alone pulse oximeters create an installed-base of monitors with proprietary Masimo SET software. MPPMs employing Masimo technology and stand-alone pulse oximeters have a life span of a number of years.

11. Sensors, which are attached to patients' bodies, collect the data which is analyzed by the computer software in pulse oximeters. Patient cables connect sensors to pulse oximeters. Patient cables are sold with pulse oximeters and are periodically replaced. Sensors and patient cables are known as consumables. Masimo consumables are compatible with pulse oximeters employing Masimo SET technology.

12. Consumables, not pulse oximeters, are by far the greatest source of revenues and earnings for makers of pulse oximetry products. In fact, consumables account for more than 80% of the revenues and earnings generated in connection with the sales of all pulse oximetry products. Hence, to succeed in the market for pulse oximetry products, it has been important for Masimo to try to place its technology in as many hospitals as possible.

**TYCO SEEKS TO RESTRAIN COMPETITION FROM MASIMO**

13. Tyco manufactures and sells pulse oximetry products under the brand name Nellcor. Nellcor began to manufacture and sell pulse oximeters and consumables in the early 1980s. Tyco licenses its Nellcor technology to OEMs and manufactures its own stand-alone pulse oximeters. In addition, Tyco has granted licenses to MPPM manufacturers that allow those manufacturers to make their own technology compatible with Nellcor sensors. Nellcor consumables are compatible with Nellcor pulse oximeters and MPPMs employing Nellcor technology. However, Tyco's patents relating to the Nellcor technology and Tyco's contracts with MPPM manufacturers have prevented Masimo from producing consumables that are compatible with the Nellcor and Nellcor-compatible pulse oximeters. Presently,

1  more than 90% of the installed base of pulse oximeters in the United States is
2  compatible with Nellcor consumables, but not with the consumables made by
3  Masimo.

4      14.   Tyco's conventional pulse oximeters failed to give accurate readings
5  for patients with low perfusion or for patients who are moving. However, until the
6  advent of Masimo SET, there were no competing pulse oximetry products that
7  performed markedly better than Tyco's. When Masimo SET technology came to
8  market, it posed a significant threat to Tyco's market dominance. Indeed, Tyco
9  itself recognized in its own statements that by inventing Masimo SET, Masimo had
10 made the "biggest stride in technological advancements" in pulse oximetry and that
11 Masimo had "raised the performance bar."

12 **RELEVANT MARKETS**

13     15.   The product markets relevant to this action are the markets for pulse
14 oximetry sensors and patient cables. The relevant geographic market is the United
15 States.

16     16.   During all time periods relevant to this action, Tyco's share of the
17 nationwide market for pulse oximetry sensors has been in excess of 90%. Similarly,
18 Tyco's share of the nationwide market for pulse oximetry patient cables has
19 exceeded 90% at all relevant times. As alleged above, more than 90% of the
20 installed base of pulse oximeters consists either of pulse oximeters made by Tyco or
21 pulse oximeters that are compatible with Tyco-Nellcor technology.

22 **DEFENDANTS' IMPROPER ABUSE OF MARKET POWER**

23     17.   Even after the advent of Masimo SET technology, Tyco has illegally
24 maintained and expanded its monopoly power in the two relevant, nationwide
25 product markets. As a consequence, buyers of pulse oximetry sensors and patient
26 cables have been forced to pay higher prices for inferior products, and Masimo, a
27 product innovator, has been effectively shut out of a substantial portion of the
28 market for pulse oximetry sensors and patient cables.

18. As set forth in greater detail below, the heart of Tyco's anti-competitive strategy has been its entry into exclusive dealing agreements with hospital group purchasing organizations ("GPOs"), with hospital groups, and with other purchasers who do not belong to GPOs or to hospital groups.

19. Hospitals ostensibly join GPOs in order to maximize their negotiating and purchasing power with suppliers. GPOs negotiate contracts with suppliers for their member hospitals, and are supposed to negotiate better deals than single hospitals could negotiate on their own. In fact, the vast majority of hospitals utilize GPOs to negotiate with suppliers on their behalf. GPOs derive a significant portion of their revenues from payments made by vendors based on purchases by GPO member hospitals under the terms of agreements between GPOs and vendors. GPOs are owned by some of their member hospitals and other member hospitals are non-owners. Member hospitals that have an ownership interest in GPOs share in payments made to GPOs by vendors and in the profits of their GPOs.

20. Contracts negotiated by GPOs with suppliers govern their member hospitals' purchases of pulse oximetry products and other medical devices. However, member hospitals, not GPOs, actually buy products from suppliers pursuant to the provisions of contracts negotiated with GPOs. When they make these purchases, member hospitals do so under terms that must be consistent with the terms of the contracts between their GPOs and suppliers. Member hospitals that do not comply with the contracts negotiated by their GPOs with suppliers face the risk of financial penalties and expulsion from their GPOs.

21. The vast majority of purchases of pulse oximetry products are made pursuant to Tyco's agreements with GPOs. GPOs are supposed to negotiate contracts with suppliers solely for the benefit of their member hospitals. However, Tyco makes substantial payments to GPOs, pursuant to its agreements with GPOs in connection with the sale of its pulse oximetry products and other products as well.

This gives Tyco significant economic leverage. Using this leverage, Tyco has succeeded in hijacking GPOs so that they serve its own purposes.

22. Tyco has done this through the payments to GPOs of millions of dollars in so-called "fees" and other forms of compensation. For example, Tyco pays to GPOs an "administrative fee" on every single sensor sold to the GPO's member hospitals. Tyco also makes additional sizable payments to GPOs in return for so-called "committed contracts," which obligate member hospitals to buy pulse oximetry products from Tyco. Thus, both GPOs themselves, and the member hospitals that have an ownership interest in GPOs, benefit from these payments.

23. Through these payments, Tyco has induced GPOs to enter into agreements that contain exclusivity provisions. Tyco designed these exclusivity provisions for the purpose of preventing competitors from challenging Tyco's monopoly. As a result of these agreements, a substantial portion of the market for pulse oximetry products, including the markets for sensors and patient cables, has been foreclosed from competition. Notwithstanding the superior quality of their products, neither Masimo nor any other smaller competitor could afford to make payments to GPOs sufficient to dislodge Tyco.

24. The exclusivity provisions of Tyco's agreements with GPOs and their member hospitals take a variety of forms. First, Tyco induces GPOs to enter into "committed" contracts under which member hospitals of GPOs are obligated to make at least 90% of their purchases of pulse oximetry products from Tyco. Second, although in some cases Tyco offers discounts to hospitals based on their dollar volume of purchases, Tyco reserves far and away its best discounts for hospitals that commit to make at least 90% of their pulse oximetry purchases from Tyco, without regard to volume. Third, Tyco provides rebates on top of its best discounts to hospitals that commit to make at least 90% of their pulse oximetry purchases from Tyco, along with a commitment to make purchases of other non-related products as well. In this way, Tyco makes rebates dependent on hospitals

purchasing 90% of their pulse oximetry products from Tyco. Thus, Tyco links both rebates and its best price discounts to an agreement not to purchase goods from competitors, not merely to volume.

25. Tyco polices adherence to the exclusivity provisions of its contracts and restrains the ability of hospitals to freely choose alternatives to these contracts. First, Tyco does not provide the best discounts on pulse oximetry products to any hospital that fails to agree to its exclusivity requirements. Second, any hospital that does not commit to buy 90% of its pulse oximetry products from Tyco is compelled to forego rebates that can total from hundreds of thousands to millions of dollars per year on unrelated products. Third, hospitals that received rebates from Tyco in the past must repay those rebates if they fail to maintain their exclusivity commitments. Over the span of several years, these rebates can amount to millions of dollars. Hence, the prospect of having to repay rebates deters hospitals from switching to any supplier other than Tyco and effectively locks hospitals into making future purchases from Tyco.

26. In addition, Tyco reports hospital violations of exclusivity requirements to GPOs and demands that GPOs enforce compliance. If GPOs do not enforce compliance, GPOs and their owner member hospitals risk losing millions of dollars in fees and other compensation from Tyco. Furthermore, Tyco also contacts hospitals directly to insist upon compliance. Hospitals that do not adhere to Tyco's exclusivity requirements face financial penalties and expulsion from their GPOs.

27. Tyco also entered into so-called "co-marketing" agreements with OEMs under which it paid OEMs a "socket" fee of approximately $75 for each MPPM they manufactured and sold in the United States that was compatible with Nellcor sensors and patient cables. Tyco also paid OEMs an additional socket fee of approximately $75 per year for each monitor in use by a hospital in the United States that was compatible with Nellcor sensors and patient cables. In exchange for the payment of socket fees, OEMs had to agree to report to Tyco information about

1 shipments of their MPPMs to hospitals. Taken together, these socket fees amounted
2 to millions of dollars per year and they contributed to Tyco's control of the installed
3 base of pulse oximeters. Insulating the installed base of Nellcor-compatible pulse
4 oximeters from competitive challenge was an important way in which Tyco
5 maintained its monopoly power in the markets for pulse oximetry sensors and
6 patient cables.

7    28.   In addition, knowing that many hospitals could not buy MPPMs that
8 were not compatible with Tyco-Nellcor products without running afoul of their
9 exclusivity commitments to Tyco, manufacturers of MPPMs were deterred from
10 installing Masimo SET technology in their MPPMs.

11    29.   Tyco has used its GPO contracts and other anti-competitive agreements
12 to lock-up more than 90% of the domestic markets for pulse oximetry sensors and
13 patient cables and to prevent Masimo from fairly competing in the foreclosed
14 portion of those markets. Consequently, Masimo has been able to sell only a
15 relatively small volume of pulse oximetry products to a confined free market
16 because Tyco's GPO agreements have effectively restrained hospital choice.

17    30.   The effectiveness of Tyco's anti-competitive practices is demonstrated
18 by the fact that it continues to dominate the market for pulse oximetry consumables
19 even though Masimo's products and distribution capabilities are superior.
20 Moreover, Masimo's products are competitively priced and are sold at a lower cost
21 of ownership to hospitals. For these reasons, hospitals that are not bound by
22 agreements with Tyco containing exclusivity provisions often choose Masimo's
23 products over the Nellcor branded products.

24    31.   Tyco's anti-competitive agreements with GPOs and with hospitals are
25 embodied in long-term contracts that have the intended goal and actual effect of
26 restraining and foreclosing free and open competition.

27    32.   The two largest GPOs in the United States are Premier, Inc. ("Premier")
28 and Novation, L.L.C. ("Novation"). Collectively, their member hospitals buy over

60% of all pulse oximetry products purchased every year in the United States. Through the payment of sizable fees, Tyco has induced Premier and Novation to enter into anti-competitive agreements with Tyco. The purpose of these agreements is for Tyco to maintain and advance its monopoly power in the relevant markets and to exclude Masimo from competitoin. Some of Tyco's specific anti-competitive agreements with Premier and Novation are described below.

**Exclusivity Agreements with Premier**

33.  Tyco and Premier have entered into "committed contracts," which obligate the more than 1,600 hospitals that are Premier members to purchase at least 90% of their pulse oximetry sensors and patient cables from Tyco, and to buy Nellcor or Nellcor-compatible pulse oximeters for at least 90% of their pulse oximeter needs. Pursuant to these contracts, Premier member hospitals receive price discounts on Tyco pulse oximetry products in exchange for their commitment to make at least 90% of their pulse oximetry purchases from Tyco. If a Premier member hospital fails to meet the 90% exclusivity requirement, then the hospital faces the threat of financial penalties and even expulsion from the Premier GPO.

34.  In addition, if a hospital fails to adhere to its 90% exclusivity requirement, Tyco is free to raise its prices on Nellcor pulse oximetry products that it sells to that hospital by more than 40%. This is very economically risky for hospitals that already own Nellcor or Nellcor-compatible pulse oximeters, because they can then be forced to pay more for Nellcor consumables that are used with the hospitals' installed base of Nellcor technology. Thus, the loss of price discounts on consumables acts as a strong-arm enforcement mechanism to require adherence to exclusivity.

35.  In addition, Tyco offers Premier member hospitals additional discounts on pulse oximetry products so long as the hospitals commit to purchase Nellcor pulse oximetry products along with other products from Tyco. Under Tyco's "Corporate Program," Premier member hospitals receive the highest level of

discounts if they agree to purchase from Tyco virtually all of their needs in connection with four different products: (1) contrast media (such as testing dyes); (2) nuclear medicine, (3) critical care products; and (4) pulse oximetry products. The agreement to participate in the Corporate Program obligates a participating hospital to purchase at least 90% of its needs with respect to each of these four Tyco products. By offering substantial discounts on each of these products, only if all of the products are purchased together, Premier and Tyco have created substantial additional leverage to induce hospitals to purchase 90% of their pulse oximetry needs from Tyco. Hence, the Corporate Program contributes to the exclusion of Masimo and other competitors.

**Exclusivity Agreements with Novation**

36. Tyco and Novation have entered into agreements that govern the terms under which Tyco sells its products to Novation's more than 2,000 member hospitals. These agreements also contain exclusivity provisions. For example, with respect to price discounts, in addition to offering discounts to Novation member hospitals based on the dollar volume of their purchases of pulse oximetry products, Tyco offers its best discounts in exchange for the agreement by a Novation member hospital to purchase 95% of its pulse oximetry sensor and patient cable needs from Tyco and also to maintain a minimum of 95% of its total pulse oximetry sites with Nellcor or Nellcor-compatible technology. Thus, the most favorable price discounts are not linked to sales volume, but instead are linked to the exclusion of competition.

37. If a hospital fails to meet its 95% exclusivity commitment, then Tyco is free to raise prices on its sale of Nellcor pulse oximetry products to that hospital. This potential price increase puts the hospital at jeopardy of having to pay higher prices for consumables to use with its installed base of Nellcor technology, and therefore functions as an enforcement mechanism to maintain adherence to exclusivity agreements.

38. In addition, Tyco and Novation have entered into contracts that link additional financial incentives to the purchase of pulse oximetry products that the member hospitals buy in combination with other products. In Novation's "Opportunity Program," a Novation member hospital receives large discounts for agreeing to purchase 95% of its applicable purchasing needs from a list of twelve product categories – including Tyco-Nellcor pulse oximetry products. In exchange for the hospital's agreement to buy 95% of its needs through the Opportunity Program, Tyco pays the participating hospital a 5-7% rebate, known as an "incentive payment," based on the total volume of purchases pursuant to the Program. This rebate, in addition to price discounts, provides a powerful incentive for hospitals to join and participate in the Opportunity Program.

39. Moreover, hospitals are not entirely free to switch out of the Opportunity Program once they have joined. First, participants in the Opportunity Program must agree not to cause Tyco "to incur defensive selling costs during the term of the Agreement (such as can be caused by entertaining proposals from other vendors or conducting product evaluations)." Second, if a hospital determines that it no longer desires to continue purchasing 95% of its needs from the Opportunity Program, then all incentive payments received at any time must be forfeited and repaid to Tyco. Thus, the longer a hospital participates in the Opportunity Program, the less likely that it can afford to pay back rebates, and the less likely that it can afford to stop purchasing 95% of its pulse oximetry needs from Tyco.

40. Tyco has similar anti-competitive agreements with other GPOs, aside from Premier and Novation, and with hospital groups, such as the Kaiser Permanente Health Maintenance Organization, and with other purchasers who do not belong to GPOs or hospital groups.

**The Anti-Competitive Effect of Tyco's Practices**

41. As a result of Tyco's anti-competitive practices, Tyco has had a direct, substantial, and adverse effect on competition by monopolizing the market for pulse

oximetry sensors and patient cables, artificially creating barriers to entry in the relevant markets, foreclosing competition on the basis of price and performance, and stifling innovation. Purchasers of pulse oximetry sensors and patient cables have been forced to pay higher prices for less innovative, inferior products.

42. Further, Masimo has been directly and proximately injured by Tyco's unlawful conduct because it has been unreasonably restrained from access to the nationwide markets for pulse oximetry sensors and patient cables, thereby depriving Masimo of: (1) past profits; (2) future profits; (3) the value of invested capital due to fruitless efforts to enter the relevant markets and sums spent to mitigate damages; and (4) other damages allowed by law.

43. A second consequence of Tyco's anti-competitive practices has been Tyco's success in excluding competition in the nationwide market for pulse oximetry sensors and patient cables.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 2 of the Sherman Act)

44. Masimo incorporates by reference and realleges the averments of paragraphs 1-43 as if fully set forth herein.

45. As alleged above, Tyco has monopolized the markets for pulse oximetry sensors and patient cables in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

46. There is a relevant nation-wide market for the sale of pulse oximetry sensors and a relevant nationwide market for the sale of pulse oximetry patient cables.

47. Tyco possesses monopoly power in each of the relevant markets.

48. Tyco's monopoly power in those markets has been achieved, maintained and advanced by its agreements with GPOs and hospitals described above. Those agreements have directly insulated the vast majority of buyers from competition for the sale of sensors and patient cables. In addition, by preserving the

entrenched position of Nellcor and Nellcor-compatible pulse oximeters in the installed hospital base, those agreements have further contributed to the maintenance of Tyco's monopoly power in the relevant sensor and cable markets. Tyco has also maintained its monopoly power in the relevant markets through the agreements it reached with OEMs for incorporation of Nellcor-compatible technology in their MPPMs, in return for which Nellcor made substantial payments.

49. Tyco has enforced its monopoly power and control over GPOs and hospitals by conducting audits of GPOs and of their member hospitals and by threatening non-complying GPOs and their member hospitals with, among other things: (i) the loss of the payment of "fees" and other compensation, (ii) the loss of price discounts, (iii) the loss of rebates, and (iv) expulsion from GPOs.

50. Through the acts described above and similar conduct and practices, Tyco has willfully and wrongfully achieved, maintained and expanded its monopoly power in the relevant markets by raising barriers to entry, by intentionally excluding Masimo from entering a substantial portion of the market, and by undermining the development of other competitors.

51. There are no legitimate business justifications for Tyco's exclusionary and anti-competitive conduct. To the extent that Tyco has sought to achieve any legitimate business purposes through its conduct, it has not used the least restrictive means for doing so, any claimed pro-competitive benefit is outweighed by the anti-competitive harm, and any purported legitimate business justifications are mere pretexts for illegal monopoly maintenance.

52. Tyco's conduct has injured consumers and harmed competition.

53. Tyco's conduct has directly and proximately caused injury to Masimo's business and property. That injury is of the kind that the antitrust laws were intended to prohibit, and therefore constitutes antitrust injury.

## SECOND CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act)

54. Masimo incorporates by reference and realleges the averments of paragraphs 1-53 as if fully set forth herein.

55. As alleged above, Tyco has entered into agreements with GPOs and hospitals for the sale of pulse oximetry products that have unreasonably restrained trade and competition in the relevant nationwide markets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

56. Tyco's anti-competitive practices have proximately caused damage to Masimo in an amount to be proven at trial.

57. There is no legitimate business justification for Tyco's anti-competitive practices and any purported legitimate business justifications are mere pretexts.

## THIRD CLAIM FOR RELIEF

### (Violation of Section 3 of the Clayton Act)

58. Masimo incorporates by reference and realleges the averments of paragraphs 1-57 as if fully set forth herein.

59. As alleged above, Tyco has entered into agreements with GPOs and hospitals for the sale of pulse oximetry products pursuant to which Tyco has conditioned the availability of discounts on the condition that the hospitals refrain from purchasing competing products, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14. The effect of these arrangements has been to substantially lessen competition in the relevant markets for oximetry sensors and cables.

60. Tyco's anti-competitive practices have proximately caused damage to Masimo in an amount to be proven at trial.

61. There is no legitimate business justification for Tyco's anti-competitive practices and any purported legitimate business justifications are mere pretexts.

# PRAYER FOR RELIEF

1. For damages in an amount to be proven at trial.

2. For an order trebling the amount of damages to be awarded pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

3. For an order granting permanent injunctive and other equitable relief prohibiting Tyco from engaging in anti-competitive conduct.

4. For the award to plaintiff of its attorneys' fees and costs of suit.

5. For an award of pre-judgment and post-judgment interest on the above sums, to the extent permitted by applicable law and at the highest rate allowed by law.

6. For such other relief as the Court may deem just and equitable.

MARC M. SELTZER
DAVID C. MARCUS
MAURICE M. SUH
SUSMAN GODFREY L.L.P.

STEPHEN D. SUSMAN
SUSMAN GODFREY L.L.P.

By _____
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Masimo demands a trial by jury of all issues triable of right by a jury.

MARC M. SELTZER
DAVID C. MARCUS
MAURICE M. SUH
SUSMAN GODFREY L.L.P.

STEPHEN D. SUSMAN
SUSMAN GODFREY L.L.P.

By _____
Attorneys for Plaintiff