Priority ☒
Send ☒
Enter ☒
Closed ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____





UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| Masimo Corporation, | ) | CASE No. CV 02-4770 MRP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OF DECISION** RE: |
| | ) | Defendant's Motion for Summary |
| | ) | Judgment |
| Tyco Health Care Group, L.P. and | ) | |
| Mallinckrodt, Inc. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BACKGROUND

Plaintiff Masimo Corporation ("Masimo") brings this antitrust action against Tyco Healthcare Group, L.P. and Mallinckrodt, Inc. (collectively "Tyco")  alleging that Masimo "has been effectively shut out of a substantial portion of the market for pulse oximetry sensors and patient cables" through Tyco's use of  "exclusive dealing arrangements," "strong-arm" tactics, and other "anticompetitive agreements" with hospital group purchasing organizations ("GPOs"), hospitals, Integrated Health Networks ("IHNs") and original equipment manufacturers ("OEMs") in violation of Sections 1 and 2 of the Sherman Antitrust Act, and Section 3 of the Clayton Act.  Complaint at ¶¶ 17,

18, 24.[1]

Tyco brings this Motion for Summary Judgment on the grounds that: (1) Masimo's first cause of action for violations of Section 2 of the Sherman Antitrust Act fails because Tyco did not possess monopoly power in any relevant market and did not engage in any wrongful conduct to maintain its market position; (2) Masimo's second cause of action for violations of Section 1 of the Sherman Act fails because Masimo does not state a claim under Section 3 of the Clayton Act in that the challenged contracts are neither exclusive nor do they foreclose a substantial share of any relevant market; and (3) Masimo's third cause of action for violations of Section 3 of the Clayton Act fails because the challenged contracts are neither exclusive nor do they foreclose a substantial share of any relevant market. *See* Defendants' Notice of Motion and Motion for Summary Judgment ("Motion")(filed under seal Mar. 22, 2004). Tyco contends that there is no genuine issue as to any material fact and that Defendants are entitled to judgment as a matter of law.

The Court has read and considered the parties' submissions on this Motion, and has determined that oral argument would not assist the Court in its decisions. Accordingly, for the reasons discussed

---

[1] Masimo's lawsuit follows a six week jury trial, during which various patents issued by Masimo and Nellcor (a subsidiary of Tyco) were litigated. The trial was bifurcated into stages, beginning with infringement and validity and then damages. The Court also heard equitable issues outside the presence of the jury. The jury found for Masimo on all claims, finding that Nellcor infringed either literally or through the doctrine of equivalents all of Masimo's patents at issue. Consequently, the jury awarded $134,528,960 in damages to Masimo in reasonable royalties and lost profits. Nellcor has since petitioned for judgment as a matter of law (JMOL) on several issues, and this Court is currently considering Nellcor's motions.

1  below, this Court rules as follows:

2      Tyco's Motion for Summary Judgment is DENIED with respect to

3  Plaintiff Masimo's Section 2 Sherman Act claims regarding Tyco's (1)

4  loyalty discounts in compliance-based agreements, (2) sole-source

5  agreements, (3) bundled rebates, (4) equipment financing programs, and

6  (5) co-marketing agreements because genuine issues of fact remain as

7  to whether these acts, when viewed in combination, amount to

8  exclusionary anticompetitive conduct.  Tyco's Motion for Summary

9  Judgment with respect to the remaining two Section 2 claims, patent

10  infringement and product disparagement, is GRANTED because as a matter

11  of law such acts do not amount to anticompetitive conduct.  Finally,

12  Tyco's Motion for Summary Judgment with respect to Plaintiff Masimo's

13  Section 3 Clayton Act claims and Section 1 Sherman Act claims is

14  DENIED because genuine issues of fact remain as to whether Tyco's

15  contracts create *de facto* exclusivity that substantially forecloses

16  the relevant market.

17  **I. Parties Filings**

18      Tyco filed this Motion for Summary Judgment on March 22, 2004.

19  *See* Defendants' Memorandum of Points and Authorities in Support of

20  Motion for Summary Judgment ("Tyco Mot.") (filed under seal Mar. 22,

21  2004); *see also* supporting declarations (Neal J. Stephens (I)

22  Declaration ("NJS I") and Neal J. Stephens (II) Declaration ("NJS

23  II")) (filed under seal Mar. 22, 2004).  At the same time, Tyco filed

24  a separate statement of uncontroverted facts in support of its Motion

25  for Summary Judgment.  *See* Defendants' Separate Statement of

26  Uncontroverted Facts in Support of Motion for Summary Judgment (filed

27  under seal Mar. 22, 2004).

28      Masimo filed its Opposition under seal on April 19, 2004.  *See*

1  Memorandum of Points and Authorities in Opposition to Defendants

2  Motion for Summary Judgment ("Masimo Opp."). In support of its

3  Opposition, Masimo filed a number of Declarations under seal. See

4  Declaration of Kevin Mosher ("Mosher Decl.") (filed April 19, 2004);

5  Declaration of Joe E. Kiani ("Kiani Decl.") (filed April 19, 2004);

6  Declaration of Professor Einer Elhauge ("Elhauge Decl.") (filed April

7  19, 2004); Declaration of Bradley R. Langdale ("Landgale Decl.")

8  (filed April 20, 2004); Declaration of Frederick A. Robertson, M.D.

9  ("Robertson Decl.") (filed April 20, 2004); Declaration of Dr. Jeffrey

10  Leitzinger ("Leitzinger Decl.") (filed April 20, 2004); Declarations

11  of Stephen E. Morrissey Volumes I-VII, Exhibits 1-269 ("Morrissey

12  Decl.")(filed April 20, 2004).

13      In addition to the Opposition and Declarations, Masimo filed a

14  statement of genuine issues of material fact. See Statement of

15  Genuine Issues in Opposition of Defendants' Motion for Summary

16  Judgment ("GI") (filed under seal April 19, 2004). Masimo also

17  responded to Defendants' Separate Statement of Uncontroverted Facts.

18  See Response to Defendants' Separate Statement of Uncontroverted Facts

19  in Opposition to Motion for Summary Judgment ("Masimo Response to

20  Uncontroverted Facts") (filed under seal April 20, 2004) and Corrected

21  Response to Defendants' Separate Statement of Uncontroverted Facts in

22  Opposition to Motion for Summary Judgment ("Masimo Corr. Response to

23  Uncontroverted Facts") (filed under seal April 20, 2004).

24      On May 3, 2004, Tyco filed (under seal) a Reply (see Reply in

25  Support of Motion for Summary Judgment ("Tyco Reply")) and Declaration

26  (see Neal J. Stephens (III) Declaration ("NJS III"). In addition,

27  Tyco replied to Masimo's response regarding uncontroverted facts. See

28  Tyco's Reply to Masimo's Response Re: Undisputed Facts in Opposition

1   to Motion for Summary Judgment ("Tyco's Reply Re: Undisput. Facts")

2   (filed under seal May 3, 2003).

3   **II. Masimo's Claims**

4        Masimo alleges that Tyco monopolizes the U.S. market for pulse

5   oximetry and has unlawfully abused its monopoly power to exclude

6   competition.  Masimo asserts that Tyco, through its exclusionary

7   anticompetitive conduct, has worked to foreclose Masimo and other

8   rivals from over 70% of the relevant market.  The specific

9   anticompetitive conduct that Masimo alleges Tyco engages in includes:

10  (1) providing "loyalty discounts" to hospitals in exchange for a

11  hospital's commitment to purchase not more than a specified percentage

12  of the hospital's requirements for oximetry products (5%-15%) from

13  Masimo or other rivals; (2) entering into "sole-source exclusive

14  dealing arrangements" with hospital GPOs and IHNs that effectively

15  prevent Masimo and other competitors from selling oximetry products to

16  GPO and IHN member hospitals; (3) offering "bundled rebates" in which

17  discounts on oximetry products were linked with discounts on

18  completely unrelated Tyco products; (4) entering into oximetry

19  "equipment financing programs" that impose financial penalties on

20  hospitals who switch to rival products; (5) entering into contracts

21  with OEMs that effectively foreclose rivals; (6) depriving Masimo of

22  the competitive advantage of its technological advances by introducing

23  products that infringed Masimo's patents; and (7) making false

24  statements to potential customers about Masimo and its products.

25  Masimo Opp. at 1; *see also* Complaint at ¶¶ 18, 21, 22, 24, 26, 27.

26  Masimo alleges that these anticompetitive acts were in violation of

27  Section 2 of the Sherman Act.

28       Masimo further alleges that Tyco's agreements with GPOs, IHNs,

1   and OEMs created a *de facto* exclusivity that substantially foreclosed

2   Masimo from entering the market in violation of both Section 3 of the

3   Clayton Act and Section 1 of the Sherman Act.   *See* Masimo Opp. at 2;

4   *see also* Complaint at ¶ 29 (alleging that "Tyco has used its GPO

5   contracts and other anticompetitive agreements to lock-up more than

6   90% of the domestic market[]", substantially foreclosing the market

7   for pulse oximetry from competition).

8   **LEGAL STANDARD FOR SUMMARY JUDGMENT**

9   Summary judgment is appropriate when the submissions show that

10   "there is no genuine issue as to any material fact and . . . the

11   moving party is entitled to a judgment as a matter of law." Fed. R.

12   Civ. P. 56(c); *Celotex Corp. V. Catrett*, 477 U.S. 317, 322-26 (1986).

13   A defendant moving for summary judgment satisfies the initial burden

14   of production by providing evidence negating any essential element of

15   the nonmovants' claims or by showing " . . . that there is an absence

16   of evidence to support the non-moving party's case." *Id.* at 325;

17   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-05

18   (9th Cir. 2000).  Once the moving party carries its burden of

19   production, the nonmoving party must come forward with specific facts

20   to support its claims. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

21   *Radio Corp.*, 475 U.S. 574, 587 (1986); *Nissan Fire & Marine*, 210 F.3d

22   at 1103.  If the nonmoving party fails to produce enough evidence to

23   create a genuine issue of material fact, the moving party wins the

24   motion for summary judgment. *Celotex Corp.*, 477 U.S. at 322; *Nissan*

25   *Fire & Marine*, 210 F.3d at 1103.  But if the nonmoving party produces

26   "enough evidence to create a genuine issue of material fact, the

27   nonmoving party defeats the motion." *Nissan Fire & Marine*, 210 F.3d

28   at 1103.

6

1 | **ANALYSIS**

2 | **I.  Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**

3 | Section 2 of the Sherman Antitrust Act prohibits monopolies,

4 | attempts to form monopolies, and combinations and conspiracies to do

5 | so.  15 U.S.C. § 2.  To establish a violation of Section 2 of the

6 | Sherman Antitrust Act, a plaintiff must show that (1) the defendant

7 | possessed monopoly power in the relevant market and (2) the defendant

8 | willfully acquired or maintained that power through "anticompetitive

9 | conduct" as opposed to gaining that power as a "consequence of a

10 | superior product, business acumen, or historical accident." *Image*

11 | *Tech. Serv., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202, 1208 (9th

12 | Cir. 1997).

13 | The possession of monopoly power in and of itself does not amount

14 | to a Section 2 violation; the monopoly power must be maintained

15 | unlawfully.  *Verizon Communications, Inc. v. Law Offices of Curtis V.*

16 | *Trinko, L.L.P.*, 124 S.Ct. 872, 879 (2004).

17 | **A. Monopoly Power**

18 | Monopoly power is defined as the "power to control prices or

19 | exclude competition." *Image Tech. Serv., Inc.*, 125 F.3d at 1202

20 | (quoting *United States v. Grinnel Corp.*, 384 U.S. 563, 570-71 (1966));

21 | *see also United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir.

22 | 1990).  Market power can be proved by either direct evidence of the

23 | "injurious exercise of market power" or through circumstantial

24 | evidence.  *Image Tech. Serv., Inc.*, 125 F.3d at 1208.  When proving

25 | monopoly power by circumstantial evidence, the plaintiff must

26 | establish more than just market share; the plaintiff must: "(1) define

27 | the relevant market, (2) show that the defendant owns a dominant share

28 | of that market, and (3) show that there are significant barriers to

7

1   entry and . . . that existing competitors lack the capacity to

2   increase their output in the short run." *Rebel Oil Co. v. Atlantic*

3   *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

4       In this Motion, Tyco argues that it does not possess the

5   requisite monopoly power necessary for any claim under Section 2.

6   Tyco Mot. at 16. Tyco concedes that it is "clearly a leader in the

7   pulse oximetry market", but subsequently contends that it neither has

8   the power to control prices nor to exclude competition. *Id.* Tyco

9   offers evidence of how Masimo's appearance in the market drove Tyco's

10   prices down 30%. Tyco Mot. at 16; NJS I Ex. A at M44747 (explaining

11   that "Nellcor has already given up at least $100M annually in pricing

12   to fight Masimo"). According to Tyco, "[t]his pricing history . . .

13   is dispositive evidence of Tyco's lack of pricing discretion, and it

14   completely negates any reasonable inference of monopoly power." Tyco

15   Mot. at 16-17.

16       Tyco's arguments, however, fail to address controlling Ninth

17   Circuit case law, which indicates that a market share exceeding 65%

18   will support a rebuttable presumption of monopoly power. *See Image*

19   *Tech. Serv., Inc.*, 125 F.3d at 1206 (explaining that proof of 65%

20   market share establishes a *prima facie* case of monopoly power) (citing

21   *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (U.S. 1946));

22   *Avery Dennison Corp. v. ACCO Brands, Inc.*, 2000 U.S. Dist. Lexis 3938,

23   at * 38 (C.D. Cal. Feb. 22, 2000)("Courts have generally found that a

24   65% market share establishes a *prima facie* case of market

25   power.")(internal citations omitted).

26       Based upon this precedent, Masimo argues that Tyco possessed

27   market power because Tyco's market share averaged 80% at all relevant

28   times. Masimo's GI 11; *see* Morrissey Decl., Ex. 209 at TH225628; Ex.

91 at TH 53550; Ex. 76 at TH 0031089; Ex. 74 TH30646.1;  Masimo Opp. at 20 (noting Tyco's "self-described" 79% market share through 2002; Tyco's share of total installed sockets[2] which exceeded 80% from 1997 through 2000, as well as Tyco's share of total U.S. revenue, which averaged approximately 80% between 1996 and 2002).

Masimo further cites Tyco's alleged gross profit margins from 1997 to 2003 (GI 12-13), Tyco's alleged practices of price discrimination and discretion among different categories of purchasers (GI 14), Tyco's alleged power to exclude rivals (GI 16), and Tyco's alleged acts in creating substantial barriers to entry in the pulse oximetry market as further circumstantial proof of Tyco's market power (GI 17).  The alleged barriers to entry that Masimo cites include: (1) significant up-front costs and lead times for research and development, to obtain FDA approval, and to achieve learning curve economies; (2) high capital costs to enter the market as compared to Tyco's "low cost manufacturing advantage"; (3) Tyco's brand recognition and brand loyalty produced by its long-standing dominance in sales and its installed base; (4) the tendency of hospitals to standardize their product choices in any given product category; (5) network effects that increase the minimum market share needed to compete efficiently in the oximetry market; (6) Tyco's intellectual property rights protecting sensor sales on its installed base of Nellcor-compatible sockets; and (7) Tyco's exclusionary agreements with oximetry purchasers, GPOs and IHN's.  *Id.*

Masimo argues that all of the above factors provide at least

---

[2] Installed sockets have been described to mean any device into which an oximetry sensor can be plugged by means of a connecting cable, such as multi-parameter patient monitoring systems ("MPPMs"), stand-alone monitors, and hand-held units.

1  circumstantial evidence of Tyco's monopoly power.  Given the relevant

2  case law and the evidence presented, this Court finds that there is at

3  least a genuine issue of fact as to whether Tyco possessed monopoly

4  power.

5  **B. Wrongful Maintenance of Monopoly Power**

6      The second element of a Section 2 monopoly claim, referred to as

7  the "conduct" element, addresses the question of whether Tyco used its

8  "monopoly power to foreclose competition, to gain a competitive

9  advantage, or to destroy a competitor." *Image Tech. Serv., Inc.*, 125

10  F.3d at 1208 (internal quotations omitted).  To prove a Section 2

11  violation, the plaintiff must show that the defendant "willfully

12  acquired or maintained [monopoly] power". *City of Anaheim v. Southern*

13  *Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).  In addition,

14  anticompetitive conduct "does not invoke the Sherman Act until it

15  harms consumer welfare." *Rebel Oil Co.*, 51 F.3d at 1433.

16      Masimo has alleged that Tyco engaged in anticompetitive conduct

17  including (1) exclusionary loyalty discounts, (2) sole-source

18  contracts with GPOs and IHNs, (3) bundled rebates, (4) equipment

19  financing programs, (5) *de facto* exclusive dealing with OEMs, (6)

20  patent infringement, and (7) product disparagement.  Masimo Opp. at

21  25-26.

22      Masimo's theory of anticompetitive conduct relies heavily upon

23  the "combined effect" of these acts when taken together.  *See* Masimo

24  Opp. at 27-28 (citing *LePage's Inc. v. Minnesota Mining &*

25  *Manufacturing Co.*, 324 F.3d 141, 162 (3rd Cir. 2003))(explaining that

26  "[t]he relevant inquiry is the anticompetitive effect of [Tyco's]

27  practices taken together"); *see also* Masimo Opp. at 2 ("The central

28  issue in this case, however, is whether Tyco has unlawfully maintained

1  monopoly power through the *combined effect* of its various

2  anticompetitive practices.") (emphasis in original).

3      This Court has previously considered Section 2 violations and has

4  found it improper "to focus on specific individual acts of an accused

5  monopolist while refusing to consider their overall combined effect."

6  *See City of Anaheim*, 955 F.2d at 1378 (affirming the lower court's

7  decision); *see also City of Mishawaka v. American Electripower*, 616

8  F.2d 976, 986 (7th Cir. 1981)(explaining that where a monopolist has

9  engaged in a broad array of exclusionary conduct to maintain its

10 monopoly, it is improper to consider "each aspect of [the

11 monopolist's] conduct separately and in a vacuum"; rather "[i]t is the

12 mix of various ingredients . . . in a monopoly broth that produces the

13 unsavory flavor").

14     Masimo, however, takes the rationale in *City of Anaheim* and

15 *Mishawaka* too far; Masimo throws into the "mix" every potential

16 allegation of misconduct without regard as to whether such conduct is

17 truly anticompetitive.  Despite this Court's willingness to consider a

18 "monopoly broth", this Court cannot allow Masimo to stretch these

19 holdings beyond their intended purpose.  The holding in *City of*

20 *Anaheim* specifically discusses the need to show specific *intent* when

21 proving specific acts of unlawful monopolistic conduct.  *See id.* at

22 1378 ("[W]e emphasize that the specific intent need not be proved by

23 direct admissions of wrongdoing.  Rather, the actions of the

24 [defendant], taken as a whole, can and should be considered.").  The

25 holding does not allow for clearly legal acts to be thrown into the

26 mix to bolster a plaintiff's antitrust case.  *See id.* ("[I]f all we

27 are shown is a number of perfectly legal acts, it becomes much more

28 difficult to find overall wrongdoing.").

1    Nonetheless, the *Anaheim* Court does allow for some flexibility in

2    deciding whether an act could be considered in the mix. *See id.*

3    ("[A] finding of some slight wrongdoing in certain areas need not by

4    itself add up to a violation. We are not dealing with a mathematical

5    equation. We are dealing with what has been called the 'synergistic

6    effect' of the mixture of the elements.").

7    ## 1. **Exclusionary Contracts/Agreements**

8    Masimo alleges that Tyco, in response to the Masimo threat, has

9    engaged in "a multi-faceted strategy to maintain its market domination

10   and preserve its monopoly profits." Masimo Opp. at 7. As part of

11   this strategy, Masimo claims that Tyco (1) imposed exclusionary

12   contracts on hospitals, GPOs, and IHNs, that "severely restricted the

13   ability of hospitals to buy Masimo's oximetry products;" and (2)

14   provided financial incentives to OEMs to "ensure that the top MPPM

15   (multi-parameter patient monitors) brands would only manufacture Tyco-

16   compatible oximetry products and enter[] into agreements with OEMs

17   that precluded the use of non-Tyco sensors with Tyco-compatible

18   sockets." *Id.* Tyco's alleged exclusionary agreements include: sole-

19   source contracts with GPOs and IHNs, market share volume/loyalty

20   discounts in compliance-based contracts, bundled rebates, equipment

21   financing programs, and co-marketing agreements with OEMs.

22   In assessing Tyco's potential liability for a Section 2

23   violation, this Court considers the effect of all the contracts in the

24   aggregate. *See Twin City Sportservice, Inc. v. Finley & Co., Inc.,*

25   676 F.2d 1291, 1302 (9th Cir. 1982) (holding that in assessing the

26   antitrust liability of a defendant the Court may look to the "overall

27   effects of a defendant's conduct in the relevant market" and finding

28   that the district court acted properly in aggregating defendant's

1   contracts in the relevant market in order to assess the Sherman Act

2   violations resulting from those contracts).   When the contracts are

3   analyzed together it becomes impossible for this Court to find as a

4   matter of law that these agreements could not amount to

5   anticompetitive conduct.

6   **a. *Volume Share Discounts in Compliance-Based Agreements***

7        Tyco offered market share volume discounts to members of the

8   following GPOs: Amerinet, Consorta, MedAssets, Novation and Premier.

9   Masimo alleges that Tyco based "the availability of discounts on the

10  condition that the hospitals refrain from purchasing competing

11  products."   Complaint at ¶ 59.   Specifically, these compliance-based

12  contracts granted substantial discounts to Tyco customers in exchange

13  for a contractual commitment: (1) to purchase no more than a small

14  percentage (usually about 10%) of sensors from Tyco's rivals and the

15  remaining percentage (usually about 90%) from Tyco; and (2) to utilize

16  Tyco monitors or Tyco compatible monitors throughout 90% (or whatever

17  the commitment level) of the hospital.   Masimo Opp. at 7.

18       Masimo argues that "Tyco's loyalty discounts have helped Tyco to

19  foreclose Masimo from 50% of the relevant market." GI 38; *see*

20  Morrissey Decl. Ex. 228, TH284964; Leitzinger Decl., Ex A ¶ 10; *see*

21  *also* Masimo Opp. at 23.   Masimo cites *LePage's*, a Third Circuit case,

22  for the proposition that "a jury could reasonably find that these

23  loyalty discounts are a *core component* of Tyco's unlawful effort to

24  exclude Masimo from the oximetry market because they reflect pricing

25  terms that are based on terms that operate to exclude competition

26  rather than to reflect the supply and demand for Tyco's products on

27  their own merits." Masimo Opp. at 23 (emphasis added) (citing

28  *LePage's*, 324 F.3d at 157-59) (holding that evidence of discounts

13

1   "designed to induce" key customers "to award business to 3M to the

2   exclusion of LePage's" supported jury verdict on a monopolization

3   claim).

4        Masimo relies upon Third Circuit authority, but fails to address

5   Ninth Circuit case law on this issue.  In *Western Parcel Express*, the

6   Ninth Circuit discusses the viability of volume discount contracts

7   within the meaning of Section 2.  *See Western Parcel Exp. v. United*

8   *Parcel Express Serv.*, 190 F.3d 974, 976 (9th Cir. 1999).  The *Western*

9   *Parcel* Court found that the contracts were not exclusive dealings

10  contracts that preclude competition in violation of the Sherman

11  Antitrust Act because a company which entered into one of these

12  contracts with UPS could "nevertheless contract with another carrier

13  for parcel delivery service."  *See id.*  Thus, *Western Parcel*

14  distinguishes between volume discount contracts and exclusive dealing

15  contracts in violation of Section 2, and holds that volume discount

16  contracts, which do not foreclose consumers from entering into

17  contracts with other delivery service providers, are "legal under

18  antitrust law".  *Id.*

19       This Court finds that the holdings in *Western Parcel* and *LePage's*

20  are not at odds; both holdings highlight the importance of exclusivity

21  and foreclosure in a Section 2 Sherman Act anticompetitive conduct

22  analysis.  *See Western Parcel*, 190 F.3d at 976 (explaining that since

23  the volume discounts contacts "did not foreclose consumers from

24  entering into contracts with other delivery service providers" they

25  were not in violation of the Sherman Act); *LePage's*, 324 F.3d at 159

26  ("The foreclosure of markets through exclusive dealing contracts is of

27  concern under the antitrust laws . . . '[U]nilaterally imposed

28  quantity discounts can foreclose the opportunities of rivals when a

1    dealer can obtain its best discount only by dealing exclusively with

2    the dominant firm.') (quoting 3A Phillip E. Areeda & Herbert

3    Hovenkamp, *Antitrust Law* ¶ 768b2, at 148 (2d Ed. 2002)).

4         Thus, whether Tyco's discounts are considered to be

5    anticompetitive conduct will turn, in part, on the factual question of

6    whether the discounts had the practical effect of making the contracts

7    exclusive agreements that substantially foreclosed the market from

8    competitors.  Tyco offers evidence against exclusivity, showing that

9    in 2002, 40% of Tyco's Premier accounts opted not to buy from Tyco at

10   the highest level of discounts and 28% of Tyco's customers purchasing

11   under the Novation contact opted not to participate in any share

12   volume discounts.  *See* Willig Report (NJS I Ex. J) at 42-43.

13        Despite Tyco's evidence, Masimo asserts that these compliance

14   based discounts, in conjunction with the sole-source agreements,

15   created *de facto* exclusivity that substantially foreclosed Masimo from

16   50% of the market.  *See* Morrissey Decl. Ex. 228, TH284964; Leitzinger

17   Decl., Ex A ¶ 10; *id.* at 39-44 (arguing that "a customer facing even a

18   relatively modest price break for maintaining 90% Nellcor compliance

19   would find it very expensive to switch more than 10% of its sensor

20   purchases to a competitor").  Thus, Masimo argues that the

21   "compliance-based pricing structure provided a major roadblock to any

22   would-be competitor, with or without actual customer commitments to be

23   compliant."  Leitzinger Decl., Ex. A, at 41.

24        Therefore, given the factual questions that remain as to whether

25   the discounts offered in Tyco's compliance-based contracts actually

26   became exclusive in practice and had the effect of substantially

27   foreclosing the market, it would be premature for this Court to remove

28   these compliance-based discounts from the monopoly mix.

**b. *Sole-Source Contracts with GPOs and IHNs***

During the relevant time period, Tyco allegedly had "sole-source" contracts with three GPOs: Premier, Novation and Consorta. *See* Premier Contract, Decl. of Neal J. Stephens (II) ("NJS II") Ex. II. P0001-P0102; Novation Contract, NJS II, Ex. JJ, NOV000927-NOV001014; Consorta Contract, NJSII, Ex. KK, TH0019793-TH0019855. Masimo argues that Tyco's sole-source contracts have created a "strong disincentive" for GPO members and IHNs to deal with Tyco's competitors and have the "effect of excluding Masimo from a substantial portion of the oximetry market." Masimo Opp. at 24; *see also* Morrissey Decl., Ex. 127, at TH0102021 (explaining that in an internal presentation, Tyco stated of its Novation sole-source agreement: "Not only did this provide an opportunity to grow the existing installed base business, but more importantly shutout our competitor from gaining a stronghold within this key GPO").

Tyco argues that the sole-source agreements cannot qualify as exclusionary anticompetitive conduct because the agreements allow the hospitals to purchase "off contract", making them non-exclusive; nonetheless, as discussed *infra*, this Court should find that there is a genuine issue of material fact as to exclusivity and foreclosure regarding these contracts. *See* Masimo Opp. at 9 (alleging that "even if hospitals could technically buy "off contract," Tyco understood that hospitals generally did not"); *see also* Leitzinger Decl., Ex. A, at 41 (Nellcor's own documents note that: "GPOs continue to dictate a hospital's direction. Any attempts at business outside of a GPO contract has [sic] been very difficult and usually not worth the time and effort it takes to get them off contract.").

1   Thus, since this Court is not able to conclude as a matter of law

2   that Tyco's sole-source agreements do not amount to exclusionary

3   anticompetitive conduct, this Court will not remove the sole-source

4   agreements from the monopoly broth.

5   **c. Bundled Rebates**

6   Tyco has "bundled" rebate programs within Premier and Novation.

7   Tyco Mot. at 8; *see also* Letzinger Decl. Ex. A, at 44-47.  Masimo

8   alleges that by 2002, over 75% of Tyco's sensor sales to Premier

9   members were to customers who were receiving bundled rebates across

10  pulse oximetry and other unrelated product categories.  *See* Leitzinger

11  Decl. Ex. A, at 53 (observing that "the portion of Nellcor's oximetry

12  sales that involved bundling arrangements increased substantially as

13  Masimo was trying to enter the market").

14  Masimo argues that "Tyco introduced bundled discount programs

15  that sought to leverage Tyco's dominant position in other products

16  with its dominant position in pulse oximetry."  Masimo Opp. at 10-11.

17  Consequently, Masimo claims that Tyco bundled its oximetry products

18  with non-oximetry markets, thereby creating an inducement to buy from

19  Tyco that Masimo could not match because Masimo only offers oximetry.

20  *See* Masimo Opp. at 24 (arguing that "[b]ecause Tyco's customers would

21  lose significant discounts on oximetry products *and* other products if

22  they bought Masimo's oximetry products, Masimo cannot efficiently

23  compete against Tyco for the customers who are subject to Tyco's

24  bundled rebate programs").  Finally, Masimo contends that these

25  bundled rebates have "created a powerful disincentive for hospitals to

26  buy Masimo's oximetry products for reasons that have nothing to do

27  with the relative merits of the competing oximetry systems."  *Id.*

28

1    Tyco does not deny that it offers these programs.  Instead it

2 argues that the rebates are "entirely voluntary" and no more exclusive

3 than procompetitive lawful discount programs; Tyco asserts that

4 "Masimo has always been free to seek these hospitals' business by

5 offering a better deal."  *See* Tyco Mot. at 8. Tyco further claims that

6 since Masimo's own profit margins were between 45% and 83%, it was

7 "well within Masimo's capabilities to offer a discount that exceeded

8 the rebates provided by the bundled programs."  *Id.*

9    Masimo cites *LePage's* for the proposition that when offered by a

10 monopolist, bundled rebates may foreclose the market to competitors

11 who do not offer a similarly diverse product line. *See* LePage's, 324

12 F.3d at 155 ("The principal anticompetitive effect of bundled rebates

13 as offered by [the defendant] is that when offered by a monopolist

14 they may foreclose portions of the market to a potential competitor

15 who does not manufacture an equally diverse group of products and who

16 therefore cannot make a comparable offer.").

17    At the core of the Third Circuit's holding on bundled rebates is

18 the idea that the defendant in that case "linked a product on which it

19 faced competition with products on which it faced no competition."

20 *Id.* at 156 (citing with approval the Court's rationale in *SmithKline*

21 *Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978)).  Such a

22 practice, the Court explained, had the effect of "magnifying" the 3%

23 rebate to a discount that was in actuality much larger, thereby

24 "insulating" the defendant's product "from true price competition with

25 [its competitor]".  *See id.*  ("The effect of the 3% bundled rebate was

26 magnified by the volume of [defendant's] products sold, so that in

27 order to offer a rebate of the same net dollar amount as

28 [defendant's], [plaintiff] had to offer purchasers of [plaintiff's

18

product] rebates of some 16% to hospitals of average size, and 35% to larger volume hospitals.") (internal quotations omitted).

Such bundled rebates have been compared to "packaging discounts" by Philip Areeda in his treatise on Antitrust Law.  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 794, at 83 (Supp. 2002).  This treatise discusses the anticompetitive effect of packaging discounts as follows:

> The anticompetitive feature of package discounting is the strong incentive it gives buyers to take increasing amounts or even all of a product in order to take advantage of a discount aggregated across multiple products. In the anticompetitive case, which we presume is in the minority, the defendant rewards the customer for buying its product *B* rather than the plaintiff's *B*, not because defendant's *B* is better or even cheaper.  Rather, the customer buys the defendant's *B* in order to receive a greater discount on *A*, which the plaintiff does not produce. In that case the rival can compete in *B* only by giving the customer a price that compensates it for the foregone *A* discount. . . . Depending on the number of products that are aggregated and the customer's relative purchases of each, even an equally efficient rival may find it impossible to compensate for lost discounts on products that it does not produce.

*Id.* at 83-84.

While none of the law cited by Masimo is binding on this Court, neither Tyco nor this Court's independent research has revealed any controlling authority in this Circuit.  Thus, given the similarity of the facts in this case to those in *LePage's,* this Court finds the Third Circuit's holding that bundled rebates may qualify as anticompetitive conduct within the meaning of Section 2 of the Sherman Act to be instructive.

Thus, the question becomes one of fact as to whether the bundled rebates act to foreclose the relevant market.  On this issue, Tyco argues that "no more than 26% of total U.S. sales of pulse oximetry consumables in any single year were made by hospitals participating in

1  bundled rebate programs." Tyco Mot. at 8; *see also* Willig Report, NJS

2  I, Ex. J, at 37 Figure 4.   Masimo argues in response that Tyco's

3  expert failed to include Tyco's bundling programs with GPOs such as

4  Amerinet, HSCA and VHA (Novation's predecessor) and with a number of

5  IHNs.  Masimo asserts that when the sales under these programs are

6  included, Masimo was foreclosed from at least 31% of oximetry sales

7  subject to programs that bundled oximetry discounts within other

8  products.  Masimo Opp at 12.

9       Given that the Ninth Circuit has held that 24% foreclosure for an

10 "unreasonable length of time" can constitute a Sherman Act violation

11 (*see Twin City*, 676 F.2d at 1304), it would be premature for this

12 Court to decide at this stage that as a matter of law the bundled

13 rebates cannot constitute anticompetitive conduct.  Thus, the bundled

14 rebates will be allowed to be shown as a possible part of the monopoly

15 mix.

16 **d.   *Equipment Financing Programs***

17      Masimo claims that Tyco used its equipment financing programs

18 with GPO and non-GPO hospitals, such as Co-OP and OTIS, to foreclose

19 competition in the relevant market.  Under Tyco's Co-OP program,

20 hospitals that signed a written commitment to purchase a high

21 percentage (80-95%) of their oximetry equipment from Tyco could

22 receive new monitoring equipment without paying any cash at the

23 outset.  Tyco's OTIS program functioned in a similar fashion; Tyco

24 would provide new monitors with no cash payment required to any

25 hospital that was willing to trade in on a rival's product.  Hospitals

26 that participated in these two programs were required to purchase Tyco

27 sensors for all their new and existing Tyco monitors.  *See* Morrissey

28 Decl., Ex. 200 at TH220359-70; EX 215 at TH228118.

1   Masimo claims that Tyco's system of not demanding monitor payment
2   up front, but instead tacking it onto sensor sales paid slowly over
3   time, is anticompetitive because to switch to a competitor the
4   hospital would have to pay the remaining cost of the monitor.  Masimo
5   is unable to offer any authoritative legal basis for its contention
6   that Tyco's equipment financing programs are anticompetitive within
7   Section 2 of the Sherman Act.  Instead, Masimo directs the Court to
8   D.C. Circuit's decision in *Microsoft*; *Microsoft* holds that an
9   exclusive dealing arrangement will not violate antitrust laws unless
10  it has the effect of blocking a competitor's access to potential
11  customers.  *United Stated v. Microsoft Corp.*, 253 F.3d 34, 59-64 (D.C.
12  Circuit 2001).

13  While this Court recognizes the general importance of that
14  holding, this Court is not convinced by Masimo's attempt to use
15  *Microsoft* to suggest that Tyco's equipment financing programs are
16  anticompetitive.  Masimo argues that approximately 40% of Tyco's
17  sensor revenues came from hospitals who had entered into OTIS and Co-
18  OP; the evidence seems to indicate that the actual percentage may
19  between 30% to 40%.  Leitzinger Decl., Ex A at 47-48 (estimating 30%);
20  Morrissey Decl., Ex 143 at TH142543 (estimating 40%); *see also* GI 74.
21  When considered on their own, Tyco's equipment financing programs are
22  arguably not exclusive.  Nonetheless, when viewed in conjunction with
23  the sole-source agreements, compliance discounts, and bundled rebates
24  discussed above, it is possible that a jury could find the overall
25  combined effect is *de facto* exclusive and substantially forecloses the
26  market. *See Twin City*, 676 F.2d at 1302 (finding that the district
27  court acted properly in aggregating defendant's contracts in the
28  relevant market in order to assess the Sherman Act violations

1  resulting from those contracts). Thus, this Court finds that Tyco's

2  equipment financing programs should be considered as a possible part

3  of the mix.

4  **e. *Co-Marketing Agreements with OEMs***

5      Masimo argues that Tyco's co-marketing agreements with OEMs have

6  prevented the OEMs from offering Masimo products, and have denied

7  Masimo access to "vital" channels of the market. Masimo Opp. at 25.

8  Masimo provides evidence that Tyco's standard form agreements to

9  provide OEMs with modules for use in MPPMs "require that OEMs in their

10  product manuals recommend only Tyco sensors for use with those

11  modules, and state that 'no other sensors should be used (including

12  sensors not manufactured by [Tyco])'". Elhauge Decl., Ex. A at 65.

13  Masimo contends that these OEM agreements had the "effect of

14  foreclosing the use of rival sensors with oximetry monitors that used

15  Tyco technology even in those cases where use of rival sensors was, or

16  could have been, technologically possible." *Id.* at 66.

17      Masimo also alleges that Tyco's standard license precluded

18  technical innovations that designed around Tyco's patented oximetry

19  technology, such as Masimo's Radical. GI 76. Specifically Masimo

20  argues that the Radical could be used with Tyco's oximetry technology

21  without violating Tyco's RCAL sensor patent and was "an efficient way

22  for a competitor to sell sensors to Tyco's installed base of sockets."

23  *Id.* Finally Masimo contends that Tyco's contracts with OEMs

24  prohibited the OEMs from selling or using the Radical, even though the

25  Radical could be utilized without violating Tyco's patents. *Id.*

26      Tyco counters that the co-marketing agreements did not contain

27  any exclusivity provisions, and provides evidence that purports to

28  show that "Tyco's OEMs could and did offer the pulse oximetry of other

22

1  vendors (including Masimo's) at the same time they offered Tyco

2  Oximetry on some of their patient monitors." Tyco Mot. at 9; *see*

3  Bednarski Depo., NJS I Ex. O, at 345 (arguing that the clause

4  "[e]ndorsement of NPB brand sensors only" in the OEM co-marketing

5  agreement did not preclude the use of competitor's sensors, and

6  explaining that such a "condition" merely meant that the OEM would ·

7  only be "*compensated* for endorsing NPB branded adhesive sensors" over

8  other competitor's sensors) (emphasis added).

9      Tyco also asserts that Masimo's complaints about being shut out

10  of the OEM channel by Tyco's OEM agreements are disingenuous, given

11  the press release that Masimo issued proclaiming its own success in

12  the pulse oximetry market. *See* Masimo Press Release (Dec. 1, 2003),

13  NJS I, Ex. P ("To date, Masimo has licensed its Signal Extraction

14  Pulse Oximetry Technology to over 35 international patient monitoring

15  system providers, which make up over 70% of the world's pulse oximeter

16  shipments.").

17      Tyco's evidence is shaky at best.  First, Tyco is only able to

18  provide deposition testimony of one person (Bednarski) as evidence in

19  support of Tyco's claims that the OEM agreements were not exclusive.

20  Further, Bednarski's testimony purports to evaluate only the plain

21  meaning of the text and "conditions" of the agreement, rather than the

22  preclusive effect that the agreement may have had on competitors.

23  Such testimony about the literal interpretation of the OEM agreements

24  is not helpful in light Masimo's claims that the agreements created *de*

25  *facto* exclusivity.

26      Masimo's press release provides somewhat more compelling evidence

27  against foreclosure of Masimo's SET technology from the market;

28  presumably if Masimo is able to license technology to OEMs that

23

1   represent over 70% of the world's pulse oximeter shipments, Masimo has

2   not been foreclosed from the OEM channel as they suggest.

3   Nonetheless, the press release, which was dated December, 2003 may not

4   be reflective of Masimo's potential foreclosure from the market, as

5   Masimo argues that it was only able to enter into OEM agreements with

6   these OEMs after Tyco terminated its co-marketing agreements.

7       While this Court is not completely convinced that these OEM

8   agreements taken in isolation would be anticompetitive, when placed

9   within the overall context of the volume discounts and sole-source

10  agreements discussed above, it is possible that given the material

11  facts, a jury could find that such contracts create *de facto*

12  exclusivity and thus violate the Sherman Act.

13      Thus, this Court finds that the *combined effect* of Tyco's

14  (1) exclusionary loyalty discounts, (2) sole-source contracts with GPOs

15  and IHNs, (3) bundled rebates, (4) equipment financing programs, and

16  (5) *de facto* exclusive dealing with OEMs creates a genuine issue of

17  fact as to whether these agreements constitute exclusionary

18  anticompetitive conduct that is in violation of Section 2 of the

19  Sherman Act.  This Court therefore DENIES Summary Judgment as to these

20  agreements.

21  **2.   Patent Infringement**

22      Masimo claims that Tyco wrongfully appropriated Masimo's market

23  share by infringing Masimo's technology.  Masimo has not cited and

24  this Court has not found any case where patent infringement has been

25  considered anticompetitive conduct.  The only case Masimo cites,

26  *Conwood Co. v. U.S. Tobacco Co.*, is irrelevant.  *See Conwood*, 290 F.3d

27  768 (6th Cir. 2002).  The *Conwood* Court considers whether tortious

28  acts committed by one competitor against another competitor's display

1 | racks in retail shops may amount to anticompetitive conduct supporting

2 | a Section 2 claim.  *See id.* at 787-88.  The case does not, as Masimo

3 | suggests, support the proposition that patent infringement may support

4 | antitrust claims brought by the patentee.  Importantly, *Conwood* does

5 | not discuss patent infringement at all.  Further, the analogy that

6 | Masimo aims to draw between its intellectual property and the property

7 | (display racks) at issue in *Conwood* is weak.  As explained in this

8 | Court's prior Memorandum of Decision RE: Motions in Limine (issued May

9 | 28, 2004), the *Conwood* Court's concern was whether the Defendant's

10 | acts should be considered isolated tortious acts, which would not be

11 | an antitrust violation, or an exclusionary pattern, which would

12 | support an antitrust claim.  *Conwood* is not analogous to this case.

13 | Thus, this Court does not find *Conwood* to be instructive on whether

14 | patent infringement may support an antitrust claim.

15 |     Further, Masimo's argument that Nellcor's patent infringement

16 | amounts to anticompetitive conduct was not a claim asserted in

17 | Masimo's Complaint or in any filing prior to its opposition to Tyco's

18 | Motion for Summary Judgment.  *See* Tyco Reply at 14 (explaining that

19 | this theory of liability "first surfaced in Masimo's Opposition

20 | memorandum, long after the close of discovery and the Court's deadline

21 | of August 4, 2003 for amending the pleadings").  To allow Masimo to

22 | assert such a new theory of liability at this late stage would

23 | prejudice Tyco.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292

24 | (9th Cir. 2000) (reasoning that to add a new theory of liability at

25 | the summary judgment stage would prejudice the defendant who faces new

26 | burdens and defenses).

27 |     Thus, for the reasons explained here and in this Court's prior

28 | Memorandum of Decision RE: Motions in Limine (issued May 28, 2004),

1 this Court GRANTS summary judgment against Masimo on Masimo's Section

2 2 patent infringement claim because as a matter of law such acts do

3 not amount to anticompetitive conduct.

4 **3. Product Disparagement**

5 　　Masimo alleges that to persuade customers to purchase its

6 products instead of Masimo's products, Tyco "has repeatedly made false

7 and disparaging statements about the quality of Masimo's products."

8 Masimo Opp. at 26.  Specifically, Masimo contends that Tyco has (1)

9 "circulated a false rumor that a baby in an Ohio hospital suffered

10 cardiac arrest while being monitored by a Masimo pulse oximeter"; (2)

11 "distributed an outdated letter from Philips concerning the

12 compatibility of Masimo's Radical with Philips monitors, even though

13 an updated letter stating that Masimo is compatible had been

14 circulated by Philips"; and (3) "falsely told customers that Masimo

15 was not a superior technology, even though Tyco privately conceded

16 that Masimo was better."  GI 88.  Masimo concludes that such

17 disparagement amounts to exclusionary anticompetitive conduct in

18 violation of Section 2 of the Sherman Act.  *See* Masimo Opp. at 26

19 (citing *Conwood*, 290 F.3d at 787 for the proposition that

20 misrepresentations to retailers could be exclusionary conduct).

21 　　As with Masimo's allegation of patent infringement, Masimo will

22 not be allowed to present product disparagement as anticompetitive

23 conduct supporting Masimo's Section 2 claim.  First, Masimo's argument

24 that Tyco's "widespread disparagement of Masimo's products" amounts to

25 anticompetitive conduct was not a claim asserted in Masimo's Complaint

26 or in any filing prior to its Opposition to Tyco's Motion for Summary

27 Judgment.  *See* Tyco Reply at 14.  Because adding a theory of liability

28 at the summary judgment stage would prejudice the defendant (as

discussed above in relation to Masimo's patent infringement theory),
this Court will not allow Masimo's product disparagement theory to be
added to the mix.  *Coleman*, 232 F.3d at 1292.

Further, Masimo has not cited and this Court has not found any
persuasive case law holding mere product disparagement to be
anticompetitive conduct.  Again, the one Sixth Circuit case that
Masimo cites, *Conwood*, does not offer guidance because, as discussed
above, the issues in that case are not analogous.  *Conwood*, 290 F.3d
at ·787.  Thus, this Court GRANTS summary judgment with respect to
Masimo's product disparagement theory of liability.

**II. Section 3 of the Clayton Act (15 U.S.C. § 14)**

Section 3 of the Clayton Act prohibits companies from making
contracts "on the condition, agreement or understanding that the
lessee or purchaser thereof shall not use or deal in the goods . . .
of a competitor or competitors for the lessor or seller" where the
effect "may be to substantially lessen competition or tend to create a
monopoly in any line of commerce."  15 U.S.C. § 14.

Section 3 of the Clayton Act seeks to prevent the anticompetitive
effects of exclusive dealing arrangements.  *See Twin City*, 676 F.2d at
1302.  To fall within the purview of Section 3, the contract must be
"truly an exclusive dealing one."  *Tampa Elec. Co. v. Nashville Coal
Co.*, 365 U.S. at 329-30.  Exclusivity alone is not sufficient to
establish antitrust violation under Section 3; the contract must also
foreclose competition.  *See Tampa Elec. Co.*, 365 U.S. at 327
(explaining that even though a contract may be found to be an
exclusive dealing arrangement, it does not violate Section 3 unless
the court "believes it probable that performance of the contract will
*foreclose* competition in a substantial share of the line of commerce

27

affected") (emphasis added); *see also Omega Envtl. v. Gilbarco*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("[T]he main antitrust objection to exclusive dealing is its tendency to foreclose existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement").

Exclusivity and foreclosure are typically considered together, since the Ninth Circuit has recognized that "virtually every contract" is arguably "exclusive." *Gilbarco*, 127 F.3d at 1162 (explaining that "virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought"). Once a contract is found to be exclusive, the first step--or the "controlling factor" in the discussion--must be to define the relevant competitive market area. *See Tampa Elec. Co.*, 365 U.S. at 329.

In determining the relevant market, the line of commerce (i.e., the type of goods, wares, or merchandise, etc. ) involved must be specified. *Id.* at 327. This inquiry is a question of fact, so where there is a dispute as to the line of commerce, the issue may not be resolved as a matter of law. *See id.* Next, the "area of effective competition in the known line of competition must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies." *Id.* (explaining that "the threatened foreclosure of competition must be in relation to the market affected").

The relevant market must be defined before the court can move on to the next part of the inquiry and "assess whether competition has been foreclosed in a substantial share of the relevant market." *Twin City*, 676 F.2d at 1302.

28

1    Courts have analyzed foreclosure in Section 3 under a "rule of

2  reason" analysis, meaning that "only those arrangements whose probable

3  effect is to foreclose competition in a substantial share of the line

4  of commerce affected will violate Section 3." *Gilbarco*, 127 F.3d at

5  1162 (indicating through citation to *Twin City* that the rule of reason

6  analysis used to determine a Section 1 Sherman Act violation is also

7  the appropriate test for a Clayton Section 3 violation); *see also*

8  *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 45

9  (1984)(O'Connor, J. concurring)("Exclusive dealing is an unreasonable

10  restraint on trade only when a significant fraction of buyers or

11  sellers are frozen out of a market by the exclusive deal.").

12  **A.   Exclusivity**

13    Masimo asserts that Tyco's exclusive dealing contracts with its

14  hospitals foreclose a significant portion of the relevant market and

15  consequently violate Section 3.  Tyco argues that for a contract to be

16  deemed exclusive, it must "completely preclude a consumer from dealing

17  with the competition." Tyco Mot. at 4.  As a result, Tyco argues that

18  since none of its agreements require total commitment, none of them

19  can be considered to be "exclusive" within the meaning of Section 3.

20  *Id.*   Tyco cites to several circuit court opinions in an attempt to

21  justify its narrow definition of exclusivity.  *See e.g., Western*

22  *Parcel Express.*, 190 F.3d at 976 ("An exclusive dealing contract

23  involves a commitment by a buyer to deal only with a particular

24  seller."); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th

25  Cir. 2000) (explaining that because consumers "were not required to

26  either purchase 100% from Brunswick or to refrain from purchasing from

27  competitors in order to receive the discount" and because consumers

28

29

1 "were free to walk away from Brunswick's discounts at any time," there

2 was no basis for antitrust injury).

3     This Court is hesitant to accept Tyco's quick dismissal of the

4 Section 3 violations for several reasons.  First, Tyco's strong

5 reliance upon both *Concord Boat* and *Western Parcel* is less persuasive

6 because neither case deals specifically with a Section 3 violation.

7 *See Concord Boat,* 207 F.3d 1039 (addressing exclusivity in the context

8 of the Sherman Act); *see Western Parcel,* 190 F.3d 974 (same).  In

9 addition, the facts in the present case are distinguishable from the

10 facts in *Concord Boat* because this case involves an alleged monopolist

11 who has engaged in a broad range of exclusionary conduct, while

12 *Concord Boat* involved "only one product" and "no allegations of tying

13 or bundling with another product."  *Concord Boat,* 207 F.3d at 1062.

14 Further, in *Western Parcel*, the court's holding on exclusivity is

15 based largely upon the "short duration and easy terminability" of the

16 contract as opposed to any purchase provision requiring 100%

17 commitment.  *See Western Parcel*, 190 F.3d at 976.

18     Finally, and most importantly, this Court does not find Tyco's

19 exclusivity arguments convincing in light of the Supreme Court's

20 acceptance of *de facto* exclusivity.  In clarifying what qualifies as

21 an exclusive dealing contract, the Supreme Court has explained that

22 "even though a contract does 'not contain specific agreements not to

23 use the [goods] of a competitor,' if 'the *practical effect* . . . is to

24 prevent such use' it comes within the condition of the section as to

25 exclusivity.'" *Tampa Elec.* Co., 365 U.S. at 329-30 (emphasis added)

26 (quoting *United Shoe Machinery Corp. v. United States*, 258 U.S. 451

27 (1922))(explaining that *de facto* exclusivity is sufficient to qualify

28 under Section 3).

1  Masimo has argued that Tyco's contracts are *de facto* exclusive.

2  *See, infra* at 15 (discussing the potential exclusivity of the

3  agreements in the Section 2 analysis); *see also* Leitzinger Decl., Ex.

4  A, at 41 (explaining that Nellcor's own documents recognize the *de*

5  *facto* exclusivity of the agreements when they concede that the

6  contractual ability to buy "off-contract" does not guarantee the

7  practical ability to do so).

8      For this Court to find that the contracts are not *de facto*

9  exclusive would require this Court to embark upon a factual inquiry

10  into the question of whether Tyco's contracts in practice effectively

11  result in a 100% commitment level, even though in actuality they only

12  require commitment levels up to 95%. Such an inquiry presents a

13  genuine issue of material fact, and is not appropriate for resolution

14  on a motion for summary judgment.

15      Thus, this Court will not use exclusivity as a basis to grant

16  summary judgment with respect to the Section 3 claims. Instead this

17  Court inquires into the second part of the analysis to see whether the

18  potentially exclusive contracts are anticompetitive (i.e. to see

19  whether they foreclose a substantial part of the relevant market).

20  **B. Foreclosure**

21      Tyco argues in the alternative that even if their contracts were

22  considered to be exclusive dealing arrangements, they would not

23  violate Section 3 because they do not foreclose a substantial part of

24  the relevant market. The Supreme Court has made clear that the first

25  part of this inquiry must be to determine the relevant market. *See*

26  *Tampa Elec. Co.,* 365 U.S. at 329. Tyco makes no effort to

27  specifically define the relevant product market; instead, Tyco

28  proceeds on the assumption that the market is limited to sale of

1  products to "intermediate-level entities, such as GPO's or

2  distributors."  *See* Tyco Mot. at 11.  From that assumption, Tyco uses

3  Ninth Circuit case law to argue that when intermediaries compose the

4  market, "the required foreclosure showing is even higher."   Tyco Mot.

5  at 11 Tyco (*citing Gilbarco*, 127 F.3d at 1162 for the proposition that

6  "exclusive dealing arrangements imposed on distributors rather than

7  end-users are generally less cause for anticompetitive concern").

8        Tyco argues that "if the allegedly foreclosed competitor could

9  access end-users through alternate distribution channels, or if the

10  allegedly restrictive covenants (assuming they were exclusive) were

11  easily terminable, the market is not foreclosed."  Tyco Mot at 12; *See*

12  *Gilbarco*, 127 F.3d at 1163 (explaining that if the competitor is "free

13  to sell directly, to develop alternative distributors, or to compete

14  for the services of the existing distributors[,] [a]ntitrust laws

15  require no more.").

16        While Tyco makes legitimate points, their ultimate argument fails

17  because of their assumptions regarding the relevant market.  First,

18  Tyco fails to specifically define the relevant product market.  Tyco

19  describes it as the pulse oximetry market; while Masimo argues that

20  the "relevant product market involves two complementary products (the

21  monitors and the sensors) that form a pulse oximetry system.  GI 7.

22  Masimo also suggests that oximetry sensors can be considered a

23  separate antitrust product market.  GI 8.  Determining the relevant

24  product market is a highly fact intensive discussion.  *See Image Tech.*

25  *Serv., Inc.*, 125 F.3d 1203 ("Ultimately what constitutes a relevant

26  market is a factual determination for the jury.").  Thus, failure to

27  designate, without dispute, the relevant product market precludes the

28  granting of summary judgment.

1    Further, if this Court were to find that the relevant product

2    market was not a genuine issue of material dispute, then the analysis

3    turns to the question of whether Tyco engaged in anticompetitive

4    conduct, meaning whether the market was substantially foreclosed.

5    This too is a factual dispute depending upon to what extent Tyco's

6    sales actually foreclosed the market. *See infra*, at 15 (discussing

7    whether Tyco's compliance-based volume discounts in connection with

8    bundled rebates and sole-source agreements foreclose 50% of the

9    market); *id.* at 20 (evidencing that Tyco's bundled rebates alone

10   arguably foreclose from 26%-31%). As noted, a court in the Ninth

11   Circuit has held that a contract restricting 24% of the relevant

12   market resulted in a cognizable foreclosure in a Section 1 case. *See*

13   *Twin City*, 676 F.2d at 1298, 1304 (noting that the appropriate

14   foreclosure analysis is to consider all exclusionary contracts in the

15   aggregate). The Ninth Circuit has also explained that it is easier to

16   meet the threshold of foreclosure for a Section 3 violation than it is

17   for a Section 1 violation. *See id.* at 1304, n.9 (noting that "a

18   greater showing of anticompetitive effect is required to establish a

19   Sherman Act violation than a [S]ection 3 Clayton Act violation in

20   exclusive-dealing cases").

21   Thus, given that substantially less than complete foreclosure

22   can, in some cases, constitute an antitrust violation, a reasonable

23   jury could find that Tyco's agreements have foreclosed a substantial

24   portion of the relevant market in violation of Section 3 of the

25   Clayton Act. This Court, therefore, DENIES Summary Judgment on the

26   Section 3 Clayton Act claims.

27

28

33

## III. Section 1 of the Sherman Act (15 U.S.C. § 1)

Section 1 of the Sherman Antitrust Act prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. *See* 15 U.S.C. § 1; *see also Twin City*, 676 F.2d at 1304 (explaining that Section 1 of the Sherman Act seeks to prevent exclusive dealing arrangements that place an unreasonable restraint on trade).  To prove a Section 1 violation, a plaintiff must show an agreement in the form of a contract, combination, or conspiracy imposes an unreasonable restraint on trade. *See id.* (explaining that "any particular exclusive dealing arrangement does not violate [S]ection 1 unless it is found to be unreasonable").

The unreasonableness of a restraint on trade is determined using either a per se standard or a rule of reason test that examines all of the circumstances. *See id.*  The Ninth Circuit has found that "exclusive dealing arrangements challenged under [S]ection 1 of the Sherman Act cannot be considered as per se violations." *Id.*, n.9 (citing *Tampa Elec. Co.*, 365 U.S. at 327).  Thus, this Court may not find that Tyco's alleged exclusive dealings are per se in violation of Section 1. *See Tampa Elec. Co.*, 365 U.S. at 327.

Under the rule of reason test, three principal criteria are used to evaluate the reasonableness of a contractual arrangement, including the extent to which competition has been foreclosed in a substantial share of the relevant market, the duration of any exclusive arrangement, and the height of entry barriers. *See Twin City*, 676 F.2d at 1304.  However, given the similarity between the Section 1 Sherman rule of reason analysis and the Section 3 Clayton rule of reason analysis, this Court need not engage in an involved discussion

34

1   of the Section 1 claims. *See infra*, at 29; *see also Gilbarco*, 127

2   F.3d at 1162.

3      This Court recognizes that the Ninth Circuit has held that a

4   contract restricting as little as 24% of the relevant market resulted

5   in a cognizable foreclosure in a Section 1 case (*see Twin City*, 676

6   F.2d at 1298, 1304). Thus, this Court may not grant summary judgment

7   as a matter of law on the Section 1 claims since Tyco's alleged

8   exclusionary agreements arguably foreclose up to 50% of the relevant

9   market. This Court, therefore, DENIES Summary Judgment on the Section

10   1 Sherman Act claims.

11                   **TYCO'S OBJECTIONS**

12      Tyco objects, pursuant to Federal Rule of Civil Procedure 56(e),

13   to the declarations of Joe E. Kiani, Kevin Mosher, Bradley R.

14   Langdale, and Frederick A. Robertson, M.D., offered by Masimo in

15   opposition to Defendants' Motion for Summary Judgment. The Court has

16   read and considered the parties' submissions on this Objection. The

17   Court did not rely upon any of the questionable statements in reaching

18   its conclusion to DENY Summary Judgement. Consequently, the Court

19   rules as follows:

20      Tyco's Objection regarding the declaration of Joe E. Kiani is

21   OVERRULED.

22      Tyco's Objection regarding the declaration of Kevin Mosher is

23   OVERRULED.

24      Tyco's Objection regarding the declaration of Bradley R. Langdale

25   is OVERRULED.

26      Tyco's Objection regarding the declaration of Frederick A.

27   Robertson, M.D. is OVERRULED.

28

**CONCLUSION**

For the foregoing reasons: this Court DENIES Defendant Tyco's

Motion for Summary Judgment with respect to Plaintiff Masimo's Section

2 Sherman Act claims regarding Tyco's (1) loyalty discounts in

compliance-based agreements, (2) sole-source agreements, (3) bundled

rebates, (4) equipment financing programs, and (5) co-marketing

agreements.   This Court GRANTS Defendant Tyco's Motion for Summary

Judgment with respect to Plaintiff Masimo's remaining Section 2

Sherman Act claims, including patent infringement and product

disparagement.   This Court DENIES Defendant Tyco's Motion for Summary

Judgment with respect to Plaintiff Masimo's Section 3 Clayton Act

claims and Section 1 Sherman Act Claims.

This Court also OVERRULES Tyco's objections to the declarations

of Joe E. Kiani, Kevin Mosher, Bradley R. Langdale, and Dr. Frederick

A. Robertson.

IT IS SO ORDERED

DATED: _____June 9, 2004_____       _Mariana R. Pfaelzer_
                                          Honorable Mariana R. Pfaelzer
                                          United States District Judge